UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| SADIQ SAIBU,<br><br>                    Petitioner,<br><br>vs.<br><br>BRENDA M. CASH, Warden,<br><br>                    Respondent. | Civil No.    10cv0844-CAB<br><br>**ORDER DENYING PETITION FOR WRIT OF HABEAS CORPUS**<br><br>**[Doc. No. 1]** |

**I.      INTRODUCTION**

        Sadiq Saibu (hereinafter "Petitioner" or "Saibu"), a state prisoner proceeding pro se, has filed a Petition for Writ of Habeas Corpus pursuant to 28 U.S.C. § 2254 challenging his San Diego County Superior Court conviction in case number SCD195049 of one count of conspiracy to commit robbery, one count of false imprisonment, three counts of robbery, and two counts of unlawful driving or taking of a vehicle.  (Lodgment No. 1, 665-67.)  Petitioner contends his federal constitutional rights were violated because 1) the trial court improperly excluded third-party exculpatory evidence of other robberies, 2) the accomplice jury instruction lessened the prosecution's burden of proof, 3) there was insufficient evidence to corroborate accomplice testimony, and 4) the trial court improperly sentenced him to a consecutive sentence on count two. (Petition ["Pet."] at 6-9; Exhibit 1 at 1-3.)

        The Court has considered the Petition and Exhibit, Respondent's Answer and Memorandum

1  of Points and Authorities in Support thereof (hereinafter "Respt's Mem."), Petitioner's Traverse, and

2  all the supporting documents submitted by the parties.  Based upon the documents and evidence

3  presented in this case, and for the reasons set forth below, the Court **DENIES** the Petition.

4  **II.    PROCEDURAL BACKGROUND**

5       On August 21, 2006, the District Attorney of San Diego County, California filed a Second

6  Amended Consolidated Information ("Information") with regard to three bank robberies - the August

7  13, 2005, Wells Fargo Bank robbery on El Cajon Boulevard, the August 19, 2005, World Savings

8  Bank robbery in La Mesa, and the August 29, 2005, Wells Fargo Bank robbery on Black Mountain

9  Road - charging Petitioner[1] with one count of conspiracy to commit bank robbery, a violation of

10  California Penal Code ("Penal Code") section 182(a)(1) (count one); one count of kidnapping for

11  robbery, a violation of Penal Code section 209(b)(1) (count two); three counts of robbery, a violation

12  of Penal Code section 211 (count three [August 13 Wells Fargo Bank robbery], count six [August 19

13  World Savings Bank robbery], and count nine [August 29 Wells Fargo Bank robbery]; three counts

14  of unlawful taking and driving a vehicle, a violation of California Vehicle Code section 10851

15  (counts four, seven, and eleven);  and one count of assault with a firearm, a violation of Penal Code

16  section 245(a)(2) (count ten).  (Lodgment No. 1 at 30-44.)  It was further alleged that as to the

17  kidnapping and robbery charges, Petitioner personally used a firearm, a violation of Penal Code

18  section 12022.53(b) (counts two, three, six and nine).  (Id.)

19       Following trial, Saibu was convicted of: (1) conspiracy to commit bank robbery (count one);

20  (2) false imprisonment (Penal Code § 236) as a lesser included offense of count two (kidnapping for

21  robbery), with the jury deadlocked on the personal use of a firearm allegation; (3) robbery (count

22  three), with the jury deadlocked on the personal use of a firearm allegation ; (4) robbery (count six),

23  with the jury deadlocked as to the personal use of a firearm allegation; (5) unlawful taking and

24  driving a vehicle (count seven); (6) robbery (count nine), with a true finding on the personal use of

25  a firearm allegation (§12022.53(b)); and (7) assault with a firearm (count ten), with a true finding on

26  the armed with a firearm allegation (§12022(a)(1).  (Lodgment No. 1, 665-677.)  The jury found

27

28       [1]  The Information also charged Antonio Valentino, Michael Jerome Squire, Keith Anthony Coleman, DeWayne Cummings, Jr., and Ken Buckley in connection with the robberies.  (Lodgment No. 1 at 31.)

1   Petitioner not guilty of kidnapping for robbery (count two).  (Id. at 670-71.)

2         On February 9, 2007, the trial court sentenced Saibu to a total state prison term of sixteen

3   years and four months, consisting of a three-year midterm on count nine, a consecutive ten year term

4   for the firearm enhancement allegation related to that count, consecutive eight month terms on

5   counts two and seven[2], and consecutive one-year terms on counts three and six.  (Lodgment No. 1 at

6   545-46,682.)  The court stayed execution on the remaining counts and allegations under section 654.

7   (Id. at 545.)

8         Saibu appealed his conviction to the California Court of Appeal for the Fourth Appellate

9   District, Division One.  (Lodgment No. 3.)  On January 14, 2009, the Court of Appeal modified the

10  restitution award and otherwise affirmed the judgment.  (Lodgment No. 6.)  Petitioner filed a petition

11  for review in the California Supreme Court, which was denied without citation of authority on April

12  15, 2009.  (Lodgment Nos. 7-8.)

13        On April 19, 2010, Petitioner filed the instant petition for writ of habeas corpus with this

14  Court.  [ECF  No. 1.] The parties consented to Magistrate Judge jurisdiction.  [ECF Nos. 1,10.]  On

15  August 30, 2010, Respondent filed an Answer.  [ECF No. 11.]  Petitioner filed a Traverse on

16  October 15, 2010.  [ECF No. 15.]

17  **III.    FACTUAL BACKGROUND**

18        This Court gives deference to state court findings of fact and presumes them to be correct;

19  Petitioner may rebut the presumption of correctness, but only by clear and convincing evidence.  28

20  U.S.C. § 2254(e)(1); see also Parke v. Raley, 506 U.S. 20, 35-36 (1992) (holding findings of

21  historical fact, including inferences properly drawn from such facts, are entitled to statutory

22  presumption of correctness).  The facts as found by the state appellate court are as follows:

23              A.   *The People's Evidence*

24              1.   *August 13 Wells Fargo Bank Robbery on El Cajon Boulevard*

25              At around 9:15 a.m. on August 13, Lucy Verduzco went to the Wells Fargo
         Bank on El Cajon Boulevard in San Diego to make a deposit.  As she was leaving the
26       bank through the south doors, a gray or light blue medium-sized, four-door car sped

27  ─────────────────

28        [2]  The abstract of judgment incorrectly lists Petitioner's last name as "Salbu" instead of "Saibu" and
    inaccurately reflects an eight- *year* term rather than eight- *month* term on count seven.  (Lodgment No. 1 at
    00545-46.)  In addition, the abstract does not reflect the three-year midterm on count nine.  (Id.)

into the parking lot and stopped in front of her.  Three armed African-American men got out of the car.  All three were dressed in dark clothing; they were wearing hooded sweatshirts and bandanas.

The three men ran up to Verduzco, and the driver of the car ordered her to go back into the bank.  Verduzco complied.

The men ran into the bank through the south door.  Two had shotguns or rifles; the other had an AK-47.  They pointed the weapons at everyone in the bank and ordered everyone to get down on the ground.  One of the men went down the teller line, pointing his weapon at each teller, saying, "Give me the [motherfucking] money.  Hurry up.  Give it to me now."  Two of the tellers handed the man cash from their drawers.  The man put the bundles of cash into a black bag.  One of the tellers pressed the silent alarm.

A second man waved a gun in the face of Jonahan Dadbin, trying to get him to open the security door to the teller windows and vault room, and demanded in an aggressive fashion that Dadbin open the door.  Dadbin refused.

After a few minutes, the three men left the bank through the south door and got into a light-colored car.  As the men fled the scene in the car, one of the bank employees wrote down a partial license plate number.  Michael Miranda, a San Diego Police Department patrol officer, responded to the call regarding the robbery and searched the surrounding area for a vehicle matching the description given by witnesses.  At around 10:00 a.m., he found a gray, two-door Acura parked about two blocks south of the Wells Fargo Bank.  The front and rear passenger doors were open.  Officer Miranda impounded the vehicle.

2.    *August 19 World Savings Bank robbery in La Mesa*

On August 19, between 8:00 and 8:15 a.m., Javier Banuelos Venegas drove his purple 1995 Ford Windstar minivan carrying California license plate No. 5CMW218 to a Shell gas station and minimart in National City.  Banuelos pulled into the parking lot, left his keys in the ignition with the engine running, and went inside the minimart to buy a cup of coffee.  When he returned to the parking lot, Banuelos found his minivan was gone.

Later that morning, at around 9:20 a.m., Banuelos's minivan pulled into the parking lot of the World Savings Bank located on Lake Murray Boulevard in La Mesa and stopped with its rear facing the employee break room.  Three African-American men, including the driver, got out of the van.  The men were wearing dark blue and black clothing consisting of sweatpants, hooded sweatshirts and bandanas.  One of them wore a medium to dark blue sweatsuit with golf raglan sleeves, black shoes, and a brown and white bandanna.  Another man was wearing gloves which were cut off at the knuckles.  All three men were carrying shotguns or rifles.  One of the men was similar in skin color, height and built[sic] to Valentino.  Another was about the same height and build as Saibu.

The men entered the bank holding their weapons.  One said, "This is a robbery.  Everybody get down on the ground."  One of the customers who was on the phone told the person on the other end of the line that a robbery was in progress and to call the police.

One of the armed men jumped on the teller counter, went to where the tellers were standing, and opened the security door for the other two armed men, who walked down the inside of the teller line in opposite directions.  One of the men

opened the teller drawers, removing the cash from the drawers and placing it in a duffel bag. One directed Jeanene Krahling, the bank's vault teller, to get the keys to the vault. After Krahling got the keys, the man held his gun to her head and told her to hurry up. She preceded him into the vault, pulled out the locker tray, and he grabbed the money from the tray. The man put the money in a black bag, thanked Krahling, and exited the vault. As all three men were leaving the bank, one of them said, "Have a nice day." The men took $14,905 during the robbery.

La Mesa police officers responding to the call about the robbery found Banuelos's minivan parked about three blocks away from the bank. One of the vehicle's sliding doors was open.

   3.   *August 29 Wells Fargo Bank robbery on Black Mountain Road*

On August 29, at around 7:00 a.m., DeWayne Cummings, Sr. (Cummings Sr.) was getting ready for work when he heard a car horn across the street. He looked outside and saw a white, box-shaped car. He woke up his son, DeWayne Cummings, Jr. (Cummings), and opened the front door to allow in Saibu, who was one of his son's friends. Cummings Sr. saw Kinsel sitting on the couch. Saibu had been to the house several times.

Later that morning, at around 9:30 a.m., three African-American men armed with rifles and wearing dark clothing, hooded sweatshirts and bandannas entered the Wells Fargo Bank on Black Mountain Road in Mira Mesa. One was carrying a duffel bag. One said, "You're being robbed. This is a robbery." Cristina Rantael, the bank's service manager pressed the silent alarm.

One of the men jumped over the teller counter and let the other two men in through the security door. One man went down the teller line, opened all the registers, took the money, and put it in a bag.

On of the men told Rantael to open the main vault. Rantael asked teller Cyrus Safa, who had the keys, to go with them to the vault. Branch manager Marian Tyler also went with them after one of the men pointed a rifle at her head and ordered her to open the security door leading to the vault room.

As Rantael was trying to open the vault door, one of the men held his rifle to her head, started counting backwards, and stopped counting when he reached two because Rantael opened the door. One of the men grabbed the money from the vault and yelled to another to get the "moneybag." The man put his gun under his arm and put the money into a duffle bag. The money that the men took contained dye packs that explode with tear gas and red dye.

The men ran out of the bank and got into a silver Mazda 626. On their way out, one said, "Have a nice day."

After the men left the bank, the dye packs exploded. When police responded to the scene, they found a medium size duffel bag in the parking lot that contained $82,133. The money in the bag was stained with red dye and smelled like tear gas.

At around 10:00 a.m. that same morning, August 29, Elliott Woodward, a college student, was sitting in his parked car on a side street near Mira Mesa Boulevard. Woodward saw people wearing dark clothing get out of a small white car, run across the street, and get into a small red car, which then drove past Woodward's car. Finding their behavior suspicious, Woodward wrote down the license plate

number of the red car, then walked over to the white car.  The engine was still running, the doors were open, and it appeared to have been hotwired.  Woodward flagged down a passing police car.  An officer impounded the white car, which was a Mazda 626.

In the afternoon on August 30, James McGhee, a detective withthe San Diego Police Department robbery unit  telephoned Saibu on Saibu's cell phone, No. (619) 709-4019.  Detective McGhee told Saibu that his name had come up in connection with a series of bank robberies that were under investigation.  Saibu told Detective McGhee he was in Mississippi with his family, he had been there about a week, and he had received a call from Cummings Sr., who told him something was going on with Saibu's cousin. Saibu said he did not know what part of Mississippi he was in, because he did not know his way around there, and his family was at work.  He indicated to Detective McGhee that when they returned, he would ask them and call Detective McGhee back.  Detective McGhee told Saibu he wanted to verify that Saibu was in Mississippi and asked Saibu to step outside and look at an address or pick up a piece of mail and check out the address.  Saibu refused and told Detective McGhee that Cummings was not involved.

When Detective McGhee then asked Saibu who was involved, Saibu responded, "Rachel [Kinsel] and Ace [Valentino]."  Saibu added that "Ace" was someone named Antonio, he did not know Antonio's last name or where he lived, and he had only met Antonio on a couple of occasions. Saibu said he would return from Mississippi on Friday and would meet with Detective McGhee in person upon his return.  Saibu complained that he was hearing that he was the mastermind.  He also told Detective McGhee that Cummings Sr. told him "[W]hen you guys find me, you're gonna shoot me on sight and some kind crap like that."  Saibu also said he was told he would be thrown in jail and given "two life sentences."  Saibu did not contact Detective McGhee that Friday as he said he would.

Detective McGhee eventually interviewed Saibu at police headquarters and told him he wanted to talk about some robberies.  Detective McGhee asked Saibu where he had been.  Saibu replied he left for New York in June or July and remained there until around Christmas time.  Saibu then changed the starting date of his New York trip to "July or August."  Saibu said he was visiting with a childhood friend and with his father.  When Detective McGhee asked whether he knew a woman named Rachel, Saibu said he did not.  Detective McGhee then asked Saibu whether he knew a woman named Rachel Kinsel.  Saibu said he had never heard that name before. When Detective McGhee told Saibu that his phone number was in Kinsel's cell phone book, Saibu said he did construction work and gave his business cards to a lot of people.  When Detective McGhee asked Saibu whether he knew Coleman, Saibu indicated he did not.  Saibu gave the same answer when asked whether he knew a man named "Ace" or Valentino, or Cummings, or "Mike [Squire]."  When Detective McGhee showed Saibu a photograph of Valentino, Saibu said he looked like a dude he had met or seen at a check cashing place a week earlier.

When Detective McGhee asked Saibu whether his fingerprints would be found in Kinsel's car, Saibu said they would be on the stereo and the inside of the car, and they could be in the trunk.  Detective McGhee asked whether Saibu had a cell phone, and Saibu replied he had several cell phones and had lost a couple of them in New York, including a phone number that began with "709."  When Detective McGhee referred to the telephone conversation he had with Saibu the previous August, Saibu first said he did not remember the conversation.  He then said he thought it was a joke.

4.   *Kinsel's plea agreement and accomplice testimony re the bank robberies*

Through the license plate information that Woodward provided, the police determined that the red car was a 1993 Mazda owned by Kinsel. Officers went to Kinsel's apartment in Imperial Beach, where they saw the red Mazda parked about 100 to 150 yards from where she lived. They searched Kinsel's bedroom and found $1,026 inside a foam container. The cash was stained with red dye.

In the afternoon on August 29, Kinsel was arrested for the August 13, 19 and 29 bank robberies. Kinsel eventually admitted she was the getaway car driver for all three robberies. Charges were filed against her, and counsel appointed to represent her.

On September 9, after consulting with her attorney, Kinsel signed an agreement titled "Agreement Regarding the Initial Meeting Between Potential Cooperating Individuals and Prosecution," under which she agreed to participate in a "free talk" interview at the district attorney's office where she would provide details about the crime.

On January 6, 2006, on the advice of counsel, Kinsel signed a second agreement, titled, "Office of the District Attorney Cooperating Individual [] Agreement" (CI agreement) and entered into a plea agreement. Kinsel pleaded guilty to three counts of armed robbery, each one a "strike," with an agreed-upon sentence range of four to seven years, in return for truthful testimony at trial. Under the CI agreement, the original charges would be reinstated if her testimony was not truthful, and she would be charged with perjury.

Kinsel testified that in August Coleman was her boyfriend. Cummings was one of Coleman's friends. In March Coleman had introduced Kinsel to his cousin, Valentino. Kinsel and Valentino became good friends, and they spoke on the phone about once a day. Coleman had also introduced Kinsel to Saibu and Squire.

Early in the morning on August 13, while Kinsel was at Coleman's house, Valentino approached her and said he, Saibu and Squire were going to rob a bank. Valentino offered her $1,000 to give them a ride after the robbery. Kinsel owned a 1993 burgundy Mazda MX6. She retrieved her car keys and went into the living room; Saibu and Squire were there. Two shotguns and a long handgun were on the floor. Sometime between 8:00 a.m. and 9:00 a.m., Valentino indicated it was time to leave and told Kinsel that he, Saibu and Squire were going to the bank in a stolen car and that she should follow them in her car. Kinsel followed them. After stopping at Polk Avenue and 30th Street, they directed Kinsel to wait there, and then they drove away. Saibu asked that she leave her car trunk open so they could put the guns in the trunk when they returned.

When Valentino, Saibu and Squire returned about 15 to 20 minutes later, they got into her car and she drove them to Coleman's house. During the return trip, appellants discussed how they wished they could have "hit the safe." Saibu paid Kinsel the agreed-upon sum of $1,000.

Kinsel testified that on August 19, she again drove the getaway car after appellants robbed a bank. That day she saw appellants in Coleman's living room. The men were wearing dark hooded sweatshirts and jeans, and each was holding a bandanna. She saw the same three guns. Appellants asked Kinsel to help by driving as she did on August 13. Appellants got into a purple van. At trial, Kinsel indicated

that a photograph of Banuelos's Ford Windstar minivan depicted the van appellants used on August 19. Valentino told her that he waited at a gas station until someone left a car with the keys in the ignition, then he "hopped in it and took it."

Driving her own car, Kinsel followed appellants to a park in La Mesa. [sic] where appellants directed her to pull over, leave the trunk open, and wait. When appellants returned about 15 to 20 minutes later, they got into her car and she drove them to Coleman's house. During the return trip, one of the appellants joked about saying "have a nice day" at the end of the robbery. Saibu paid $1,000 to Kinsel, who gave some of the money to Coleman.

Kinsel also testified that one of the appellants asked her to again be the getaway driver in a robbery that would take place on August 29. Saibu had telephoned her a couple of days earlier to tell her about the plan. In the evening on August 28, Saibu phoned Kinsel and asked her to pick him up early the next morning and to call him at 5:00 a.m. When Kinsel called Saibu early in the morning on August 29, Saibu gave her directions to his location in east San Diego. She could not find the location and telephoned Saibu several times on his cell phone while she was in her car to tell him she was lost. Kinsel finally met up with Saibu between 5:20 and 5:30 a.m., and Saibu got into her car. Saibu told her to drive him to Mira Mesa, then directed her to a Wells Fargo Bank near Black Mountain Road. Saibu showed her a side street near the bank and told her that was where she would wait for them[.] Kinsel then drove Saibu back to where she had picked him up.

At some point in the morning on August 29, Valentino telephoned Kinsel and asked her for a ride. She drove Valentino to Cummings's house, where she and Valentino met Saibu and Squire. Kinsel saw Saibu take the guns out of his car. Appellants put on black hooded sweatshirts and dark jeans. Squire's sweatshirt had the word "Outkast" on it. Saibu told her that because the police would be looking for three African-American men, on the return trip Squire would lie down on the back seat, he (Saibu) would hide in the trunk, and because Valentino is not Black, he would sit in the front seat with Kinsel.

Appellants went to the bank in a silver Mazda, and Kinsel followed them in her car. She stopped and waited at the prearranged location. When appellants returned about 20 minutes later, they had a small black duffel bag, and it looked like they had been crying. Kinsel asked what was wrong, and Valentino said something about gas going off. Saibu put the guns in the trunk of Kinsel's car. Kinsel drove appellants back to Cummings's house. Kinsel was paid $1,000 for her assistance.

(Lodgment No. 6 at 9-19.)

## IV.   **DISCUSSION**

### A.   **Scope of Review**

Title 28, United States Code, § 2254(a), sets forth the following scope of review for federal habeas corpus claims:

The Supreme Court, a Justice thereof, a circuit judge, or a district court shall entertain an application for a writ of habeas corpus in behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States.

28 U.S.C.A. § 2254(a) (West 2006) (emphasis added). As amended, 28 U.S.C. § 2254(d) reads:

        (d) An application for a writ of habeas corpus on behalf of a person in custody
    pursuant to the judgment of a State court shall not be granted with respect to any
    claim that was <u>adjudicated on the merits</u> in State court proceedings unless the
    adjudication of the claim –

            (1) resulted in a decision that was contrary to, or involved an
        unreasonable application of, clearly established Federal law, as
        determined by the Supreme Court of the United States; or

            (2) resulted in a decision that was based on an unreasonable
        determination of the facts in light of the evidence presented in the
        State court proceeding.

28 U.S.C.A. § 2254(d)(1)-(2) (West 2006) (emphasis added).

    "The Anti-Terrorism & Effective Death Penalty Act [AEDPA] establishes a 'highly deferential standard for evaluating state-court rulings, which demands that state-court decisions be given the benefit of the doubt.'" <u>Womack v. Del Papa</u>, 497 F. 3d 998, 1001 (9th Cir. 2007) (quoting <u>Woodford v. Viscotti</u>, 537 U.S. 19, 24 (2002)).  To obtain federal habeas relief, Saibu must satisfy either § 2254(d)(1) or § 2254(d)(2).  <u>See Williams v. Taylor</u>, 529 U.S. 362, 403 (2000).  The Supreme Court interprets § 2254(d)(1) as follows:

    Under the "contrary to" clause, a federal habeas court may grant the writ if the state
    court arrives at a conclusion opposite to that reached by this Court on a question of
    law or if the state court decides a case differently than this Court has on a set of
    materially indistinguishable facts.  Under the "unreasonable application" clause, a
    federal habeas court may grant the writ if the state court identifies the correct
    governing legal principle from this Court's decisions but unreasonably applies that
    principle to the facts of the prisoner's case.

<u>Williams</u>, 529 U.S. at 412-13; <u>see also</u> <u>Lockyer v. Andrade</u>, 538 U.S. 63, 73-74 (2003).

    Where there is no reasoned decision from the state's highest court, the Court "looks through" to the underlying appellate court decision.  <u>Ylst v. Nunnemaker</u>, 501 U.S. 797, 801-06 (1991).  If the dispositive state court order does not "furnish a basis for its reasoning," federal habeas courts must conduct an independent review of the record to determine whether the state court's decision is contrary to, or an unreasonable application of, clearly established Supreme Court law.  <u>See Delgado v. Lewis</u>, 223 F.3d 976, 982 (9th Cir. 2000) (overruled on other grounds by <u>Lockyer</u>, 538 U.S. at 75-76); <u>accord</u> <u>Himes v. Thompson</u>, 336 F.3d 848, 853 (9th Cir. 2003).  However, a state court need not cite Supreme Court precedent when resolving a habeas corpus claim  "so long as neither the reasoning nor the result of the state-court decision contradicts [Supreme Court precedent,]" the state court decision will not be "contrary to" clearly established federal law.  <u>Early v. Packer</u>, 537 U.S. 3,

1   8 (2002).

2   **B.   <u>Analysis</u>**

3   Saibu alleges his federal constitutional rights were violated because: (1) the trial court

4   improperly excluded evidence of robberies committed in the same manner, and during the same

5   general time period, as the charged crimes, which suggested individuals other than Saibu and his co-

6   defendants committed the charged crimes; (2) the accomplice jury instruction given in this case,

7   California Criminal Jury Instructions ("CALCRIM") No. 335, lessened the prosecution's burden of

8   proof because it instructed the jury that the evidence corroborating an accomplice's testimony need

9   only be slight and "tend to" connect the accomplice with the charged crime, rather than instructing

10  jurors that corroboration must be proven beyond a reasonable doubt; (3) the evidence was

11  insufficient to corroborate the testimony of accomplice Rachel Kinsel (hereinafter "Kinsel"); and (4)

12  the trial court imposed a consecutive term on count two based on facts not found true by a jury

13  beyond a reasonable doubt.  (Pet. at 6-9; Exhibit at 10, 20, 30, 36.)

14  Respondent asserts, with respect to claims one and four, the state court's adjudication of the

15  claims was neither contrary to, nor an unreasonable application of, clearly established Supreme

16  Court law.  (Resp't Mem. at 21.)  Respondent argues that claims two and three fail to state a federal

17  constitutional question and are meritless.  (<u>Id.</u> at 18, 19.)

18  1.   *<u>Third Party Exculpatory Evidence of Other Robberies</u>*

19  In claim one, Saibu contends that the trial court violated his Sixth Amendment right to

20  confrontation and a jury determination of the facts by improperly excluding potentially exculpatory

21  evidence of other robberies.  (Pet. at 6; Exhibit at 10.)  Petitioner argues that the trial court

22  improperly excluded the evidence because it erroneously applied the standard articulated in <u>People v.</u>

23  <u>Arline</u>, 13 Cal.App.3d 200 (1970) for the admission of third party culpability evidence, requiring

24  "some competent and substantial proof of a probability" that a third person committed the charged

25  crime.  (Exhibit at 17.)  However, Petitioner contends the <u>Arline</u> standard was rejected in <u>People v.</u>

26  <u>Hall</u>, 41 Cal.3d 826 (1986) and therefore the court should have applied the standard articulated in

27  <u>Hall</u> ("<u>Hall</u> test"), under which there must be direct or circumstantial evidence linking the third party

28  to the actual perpetration of the crime which is capable of raising a reasonable doubt of defendant's

-10-                                                          10cv0844

1   guilt, and the court must determine whether the evidence is substantially more prejudicial than

2   probative under California Evidence Code section 352.  (Id. at 17-18.)   According to Saibu, the trial

3   court violated his federal his due process rights by excluding the evidence, citing Holmes v. South

4   Carolina, ("Holmes") 547 U.S. 319 (2006).  (Id. at 18.)  Petitioner contends the Court of Appeal

5   similarly erred in affirming the trial court's exclusion of the evidence by applying the higher standard

6   articulated in Arline.  (Id. 17.)  In the alternative, Petitioner contends the evidence of numerous

7   similarities between the charged and uncharged crimes should have been admitted to show identity

8   through common modus operandi, as it would be under California Evidence Code Section 1101

9   citing People v. Sullivan, 151 Cal.App.4th 524 (2007), and People v. Donnell, 52 Cal.App. 3d 762

10  (1975).  (Exhibit at 15-16.)

11          Respondent counters that the state courts properly applied the Hall test in finding the

12  proffered evidence was simply "too general" to support its admission, and it was insufficient to raise

13  a reasonable doubt as to Petitioner's guilt.  (Resp.'s Mem. at 17.)  According to Respondent, the

14  United States Supreme Court in Holmes specifically approved of the standard set forth in Hall as

15  consistent with federal constitutional principles, therefore, both the trial court's exclusion of third

16  party culpability evidence and the appellate court's affirmation of the trial court relying on Hall, was

17  neither contrary to, nor an unreasonable application of, clearly established Supreme Court law.  (Id.

18  at 12, 17.)

19          Petitioner challenged the trial court's exclusion of this evidence in a petition for review he

20  filed in the California Supreme Court which was denied without citation of authority.  (Lodgment

21  Nos. 7, 8.)  Because there is no reasoned decision from the state's highest court, the Court "looks

22  through" to the underlying appellate court decision.  Ylst v. Nunnemaker, 501 U.S. 797, 801-06

23  (1991).  The Court of Appeal summarized the claim as follows:

24          On August 10, 2006, Valentino filed a set of in limine motions, including one
        asking the court to admit "third party culpability" evidence of other bank and credit

25      union robberies and attempted robberies committed by different suspects in San
        Diego County in June and July of 2006.  Attached as exhibits to the motions were two

26      news articles ("Authorities Identify Possible Serial Bank Robbers," published Aug. 5,
        2006, at the Yahoo! News web site and "Warrants issued for men linked to bank

27      robberies: Up to 10 crimes could be related," published August 4, 2006, in The San
        Diego Union-Tribune newspaper) reporting that two African-American men, 24-year-

28      old Jean Pierre Rices and 31-year-old Lewis Hodges, were suspects in up to 10 actual
        or attempted robberies committed between June 1, 2005 and July 31, 2006.

Specifically, the articles stated that Rices and Hodges were suspected of trying to rob a Bank of America branch on Second Street in El Cajon on July 28, 2006; of robbing a Washington Mutual bank branch on Winter Gardens Boulevard in Lakeside on July 31, 2006; and of trying to rob the USA Credit Union on Black Mountain Road in Mira Mesa, also on July 31, 2006.  The articles reported that authorities believed Rices and Hodges might also be responsible for seven other bank robberies or attempted robberies. [fn omitted.] The robberies listed in the articles did not include any of the four robberies involved in the instant case, all of which were committed in 2005.  Valentino's codefendants joined in this motion.

The court held a two-day hearing on the motion.  Cofedendants' counsel asked the court to admit evidence of the June 2005-July 2006 robberies and attempted robberies because they involved the same modus operandi involved in the commission of the 2005 offenses at issue in the instant case.

Upon inquiry from the court, all defense counsel agreed there was no direct evidence linking any third pary to one or more of the crimes charged in the instant case.  The reporter's transcript of the August 22, 2006 hearing shows the following exchanges took place between the court and defense counsel:

"The Court: . . . I think everybody can agree there's no direct evidence linking any unnamed third party to the crimes that are charged; is that something that everybody can agree on?

"[Valentino's counsel, Keith Rutman]: Such as, yeah. An informant who says that Mr. Smith out there is the guy who really did these bank robberies.  I think I'd have to agree that there's no evidence like that.

"The Court: Mr. Cox, related to direct evidence, do you agree?

"[Squire's counsel, Joseph Cox]: I agree.

"The Court: Mr Puglia?

"[Saibu's counsel, Frank Puglia]: Yes, Your Honor.

"The Court: Ms. Bukowski?

"[Cummings' counsel, Roxane Bukowski]: Yes.

"The Court: Mr. Fielding?

"[Coleman's counsel, John Fielding]: Yes.

"The Court: Okay.  So the only thing is w[h]ether or not . . . the circumstantial evidence . . . is sufficient to warrant allowing the third party culpability defense."

The court informed counsel that "where I'm stuck at is the requirement that there has to be some direct or circumstantial evidence.  I understand what circumstantial evidence is, connecting a third party to these crimes. [¶] . . . I think it's far too generic to just say there were other Black men out there committing crimes.  We have police reports in evidence.  There has to be some link.  There has to be something that connects them there other than something that's marginal [such] as

1    race and some aggressive style."

2          On August 23, 2006, the second day of the hearing, Saibu's counsel made an
     additional offer of proof regarding three bank robberies committed on May 3, June 3,
3    and July 7 of 2005, which he claimed demonstrated "pretty much the same [modus
     operandi]."

4
           After considering the relevant case law, the court denied without prejudice the
5    defense in limine request to present the proffered third party culpability evidence.
     The court indicated that the issue to be determined was whether the proffered
6    evidence was capable of raising a reasonable doubt as to the defendants' guilt with
     respect to the charged crimes; and, specifically, whether there was a sufficient direct
7    or circumstantial evidentiary link between the charged and uncharged offenses.
     Noting that "we have several bank robberies that are similar as to time" and general
8    location with similar modus operandi involving dark clothing, masks, guns, and
     aggressive behavior, the court found the similarities argued by defense counsel were
9    "far too general" to allow the court to make a finding that the evidence was capable of
     raising a reasonable doubt as to the defendants' guilt.

10
           During trial, the defense renewed the motion to present the proffered third
11   party culpability evidence.  The court again denied the motion, finding that the
     defense had provided no substantive evidence of a link or nexus between the
12   uncharged robberies and the offenses charged in this case.

13   (Lodgment No. 6 at 24-27.)

14         The appellate court articulated the applicable legal standard set forth in <u>Hall</u>, stating:

15         [T]he [California] Supreme Court in <u>Hall</u> adopted a two-step test (<u>Hall</u> test)
     for determining the admissibility of proffered third party culpability evidence.  First,
16   the court must determine whether there is *direct* or *circumstantial* evidence that both
     links the third party to the actual perpetration of the crime and is *capable of raising a*
17   *reasonable doubt of defendant's guilt.*  (<u>Hall</u>, *supra*, 41 Cal.3d at p. 834; accord
     <u>People v. DePriest</u> (2007) 42 Cal.4th 1, 43 ("Under <u>Hall</u> and its progeny, third party
18   culpability evidence is relevant and admissible only if it succeeds in 'linking the third
     person to the actual perpetration of the crime'"). . . Second, the court must determine
19   whether the evidence is admissible under Evidence Code section 352.  (<u>Hall</u>, <u>supra</u>, at
     pp. 834-835; accord, <u>Bradford</u>, <u>supra</u>, 15 Cal.4th at 1325 [in assessing an offer of
20   proof relating to evidence of the culpability of a third party, the court "must decide
     whether . . . it is substantially more prejudicial than probative under Evidence Code
21   section 352"].)  The United States Supreme Court has approved the <u>Hall</u> test under
     federal constitutional principles.  (<u>Holmes v. South Carolina</u> (2006) 547 U.S. 319,
22   326-327).

23   (Lodgment No. 6 at 28) (emphasis added.)

24         The Court of Appeal "conclude[d] the trial court did not abuse its discretion in finding the

25   proffered circumstantial similarities between the uncharged robberies and the charged robberies were

26   'too general' to support a finding that the evidence was capable of raising a reasonable doubt as to

27   the defendants' guilt." (Lodgment No. 6 at 29.)  The court reasoned:

28   ///

-13-

1       The record of the in limine proceedings shows the court carefully considered

2 all 14 of the proffered circumstantial similarities argued by defense counsel.  For example, the court found that "it's far too generic to just say there were other Black

3 men out there committing crimes," and "[t]here has to be something that connects them there other than something that's marginal [such] as race and some aggressive

4 style."  The court discussed the two robberies in which tellers with guns to their heads were taken to a vault and the perpetrator holding the gun counted backwards to get

5 the teller to hurry up in opening the vault.  The court also noted that "we have several bank robberies that are similar as to . . . general times" and "general locations," and

6 "[i]t appears that they have similar [modus operandi] that has been previously listed - black clothing, dark clothing, masks, guns, aggressive behavior, things of that

7 nature."  Stating it "just cannot, in the facts that we have, get beyond the general similarities," the court found the proffered similarities were "far too general" to allow

8 the court to make a finding that the evidence was capable of raising a reasonable doubt.  The court did not abuse its discretion.  Because the proffered evidence was

9 insufficient under the first prong of the <u>Hall</u> test to raise a reasonable doubt as to Saibu's . . . guilt, [therefore] we need not reach the second prong of that test, and we

conclude the court did not err by excluding that evidence."

10

(<u>Id.</u> at 30.)

11

12       The federal Constitution guarantees a criminal defendant the right to present a meaningful

13 defense, "whether rooted directly in the Due Process Clause of the Fourteenth Amendment . . . the

14 Compulsory Process or Confrontation Clauses of the Sixth Amendment."  <u>Crane v. Kentucky</u>, 476

15 U.S. 683, 690 (1986); <u>Holmes</u>, 547 U.S. at 324.  However, the accused does not have an unfettered

16 right under the Due Process Clause to offer relevant evidence that is unduly prejudicial, confusing,

17 privileged or otherwise inadmissible under standard rules of evidence.  <u>See</u> <u>Montana v. Egelhoff</u>,

18 518 U.S. 37, 41-42 (1996); <u>Perry v. Rushen</u>, 713 F.2d 1447, 1453 (9th Cir.1983).  Third party

19 culpability evidence may be excluded "if its probative value is outweighed by certain other factors

20 such as unfair prejudice, confusion of the issues, or potential to mislead the jury."  <u>Holmes</u>, 547 U.S.

21 at 326.  Even if the exclusion of evidence rises to the level of constitutional error, the erroneous

22 exclusion must have had "a substantial and injurious effect" on the verdict for habeas relief to be

23 granted.  <u>Brecht v. Abrahamson</u>, 507 U.S. 619, 623 (1993).

24       Petitioner has not demonstrated that the trial court's exclusion of third party evidence and the

25 appellate court's affirmation of that decision, was contrary to, or an unreasonable application of,

26 clearly established federal law, or that it had a substantial and injurious effect on the verdict.  The

27 Court concludes that the state court correctly applied the <u>Hall</u> standard, as adopted by the United

28 States Supreme Court in <u>Holmes</u>, in focusing on whether there was sufficient direct or circumstantial

1   evidence to link the uncharged crimes to the charged crimes that was capable of raising a reasonable

2   doubt as to the defendant's guilt.

3       Under Hall, third party evidence must have a connection to the charged crimes, in particular

4   facts or evidence that suggests someone other than defendant committed the charged crime.  Id., 41

5   Cal. 3d 826 (1986); see also Ayala v. Ayers, 2008 WL 313817 (S.D. Cal. 2008.)  The defendant in

6   Hall was arrested and ultimately convicted for murder based on information from an informant.  41

7   Cal. 3d at 826.  When the informant was arrested for drunk driving, he recounted very specific

8   details about the murder.  Id. at 829-30.  At trial, defendant attempted to introduce third party

9   culpability evidence showing the informant or someone else committed the crime and based his

10  theory on the fact that the informant had "intimate details of the murder not mentioned by the

11  defendant; on the fact that the victim's hyoid bone was broken on the left side [of his neck], although

12  defendant is right-handed; and on the proposed testimony of [the informant's] estranged wife that he

13  [was] left-handed, [was] violent when drunk, and ha[d] a history as a police informant."  Id. at 830.

14  The trial court applied Arline and held that the evidence was inadmissible because it did not show

15  "substantial proof of a probability" that the informant committed the murder.  Id. at 830.

16      The appellate court in Hall determined that the trial court wrongly excluded the evidence,

17  noting that defendant had submitted sufficient offers of proof linking the informant to the actual

18  murder, including distinctive waffle-stomper shoe prints at the murder site, like those worn by the

19  informant around that time, the left-handedness of the informant, and his knowledge of unique facts

20  about the murder.  Id. at 833.  The court of appeal reasoned:

21          To be admissible, the third-party evidence need not show "substantial proof of
            a probability" that a third person committed the act; it need only be capable of raising
22          a reasonable doubt of defendant's guilt.  At the same time, we do not require that any
            evidence, however remote, must be admitted to show a third party's possible
23          culpability. As this court observed in Mendez, evidence of mere motive or
            opportunity to commit the crime in another person, without more, will not suffice to
24          raise a reasonable doubt about a defendant's guilt: there must be direct or
            circumstantial evidence linking the third person to the *actual* perpetration of the
25          crime.

26  Id. at 833 (emphasis added).

27      In the instant case, Petitioner attempted to argue that the evidence of other robberies with

28  similar M.O. could "establish identity though evidence of modus operandi," raising a reasonable

1    doubt that he committed the crimes.  (Exhibit at 18.)  However, unlike the defendant in <u>Hall</u>, who

2    proffered specific items of evidence linking the informant to the murder, nothing in the newspaper

3    articles specifically connected the uncharged robberies to the charged crimes.  (Lodgment No. 1,

4    Exhibit at 17-19.)  At most, the articles described two young African-American males with

5    semiautomatic handguns and an assault rifle jumping over counters during robberies committed from

6    June 2005 until July 2006.  (<u>Id.</u>)  During trial, the court specifically asked the parties whether there

7    were any distinctive marks on the clothing worn by the suspects in the uncharged robberies that

8    would link them to the charged crimes, to which the parties responded there were not.  (Lodgment

9    No. 2 at 117.)  As noted above, defense counsel also argued that there was a link between at least

10   one of the uncharged robberies and one of the charged robberies because a perpetrator held a gun to a

11   bank teller's head and counted backwards in an effort to speed her up.  (<u>Id.</u> at 131-32.)  Although the

12   court acknowledged that the counting aspect was "an interesting fact being added to the equation"

13   and that it was unique in some senses, it could not "get beyond the general similarities . . . even with

14   the adding of the counting down, it's far too general to point back to this specific charge to . . . allow

15   me to make a finding that the evidence is capable of raising a reasonable doubt."  (<u>Id.</u> at 135, 137-

16   38.)

17        When defense counsel attempted again during trial to introduce the evidence, the court

18   reiterated that there needed to be something more specific linking the uncharged crimes to the actual

19   crimes charged under <u>Hall</u> and offered the following:

20        [I]f you had an FBI agent come in, either the team leader or anybody that's
          investigating those crimes, and say that - - above and beyond the similarity in the
21        method, or the MO - - that they have evidence linking the two, there is beyond just the
          common method - - I don't know what that evidence would be: a fingerprint; an
22        identification; something that would say that, yes, these persons not yet identified to
          me in this court are the individuals or *likely could be* the individuals that committed
23        this crime because of these pieces of evidence - - I think - - I'm stuck that black males
          wearing masks, with shotguns, is just far too generic in and of itself to survive the
24        <u>Hall</u> standard of evidence linking them to the actual perpetration of this crime.

25   (<u>Id.</u> at 1372-73) (emphasis added).

26        Petitioner argues that the trial court thereby reinstated the <u>Arline</u> test by requiring "substantial

27   proof of a probability" that a third person committed the crime, despite the <u>Hall</u> Court's rejection of

28   this standard.  (Exhibit at 17.)  As defense counsel vigorously argued at trial, Petitioner contends

1   that the court set the standard so high that no third party culpability evidence could ever meet the test

2   without also exculpating defendants.  (<u>Id.</u> at 1378-79.)  "With your requirement . . . [] - - we'd never

3   have a third-party culpability.  We would have the third party who's involved being tried and a

4   defendant who wanted the third-party culpability dismissed because you're requiring fingerprint,

5   DNA, eyewitness, admission.  We wouldn't have a third-party culpability issue."  (<u>Id.</u> at 1378-79.)

6        Contrary to Petitioner's assertion,  the trial court did not require that Petitioner show substantial

7   proof of a probability that someone else committed the crime, nor did the court require evidence which

8   could exculpate defendant.  Instead the court made clear that under <u>Hall</u>, the evidence must cast doubt

9   on defendant's guilt by inferring someone else *may* have committed the charged crime, and that this

10  circumstantial evidence must *actually* link someone else to the charged crimes.  (Lodgment No. 2 at

11  1378.)   The court noted that any inferences that could possibly be drawn from the similarities

12  between the charged and uncharged crimes here were too general, reasoning:

> 13   Any reasonable person that exercises a choice to rob a bank, if there is such a
> person, knows they should mask up.  And they would probably be more effective with
> 14   the mask than with general clothing that is not unique; and being armed would be
> better than being unarmed; and directing people to move in certain fashions, get on
> 15   the ground or face the wall. ¶ I don't think those are specific or unique enough facts.

16  (<u>Id.</u> at 1381-82.)

17       The trial court effectively illustrated the M.O. used in the uncharged and charged robberies

18  was not so unique as to suggest there was a distinctive link that would raise a reasonable doubt

19  regarding Petitioner's guilt of the charged offenses.

20       The appellate court similarly did not err when it affirmed the trial court's exclusion of the

21  evidence.  The Court of Appeal determined the trial court carefully considered all the similarities

22  between the charged and uncharged acts, and that it correctly held the evidence was too general to

23  raise a reasonable doubt about Saibu's guilt regarding the charged bank robberies.  (Lodgment No. 6

24  at 30.)

25       Petitioner's contention that the appellate court elevated the standard of proof to require

26  Petitioner show that someone else definitively committed the crimes charged is incorrect.  Rather,

27  the Court of Appeal illustrated why the evidence was too general to serve as circumstantial evidence

28  of a link between the uncharged crimes and the charged crimes, in accordance with the standard set

1   forth in <u>Hall</u> and adopted in <u>Holmes</u>.  (<u>Id.</u> at 29-30.)  In this manner, the appellate court demonstrated

2   that the evidence was properly excluded because it had "only a very weak logical connection to the

3   central issues."  <u>See</u> <u>Holmes</u>, 547 U.S. at 330.  Moreover, Petitioner does not cite to any state or

4   federal cases in which evidence of other crimes with very generic modus operandi has been properly

5   admitted as third party culpability evidence, nor has the Court found any.

6           In the alternative, Petitioner contends that the evidence was admissible under California

7   Evidence Code section 1101.[3]  (Exhibit at 18.)  Saibu reasons that "there is no logical distinction

8   between offering evidence of uncharged bank robberies under section 1101 to prove the defendant

9   committed the charged robbery - which was the situation in <u>People v. Sullivan</u> and <u>People v.</u>

10  <u>Donnell</u>- and the purpose for which [Petitioner] offered the evidence of the uncharged robberies . . .

11  [to] establish identity through evidence of modus operandi."  (<u>Id.</u>)  Petitioner's argument is

12  unpersuasive.  As Petitioner notes, <u>Sullivan</u> and <u>Donnell</u> allow the introduction of "other crimes"

13  evidence under California Evidence Code section 1101 in order to prove a defendant committed the

14  charged crimes.  <u>See</u> <u>Sullivan</u>, 151 Cal.App. 4th at 557-58 (evidence of other robberies admissible to

15  show common plan or scheme to prove defendant committed charged robberies because charged and

16  uncharged crimes shared distinctive common marks); <u>see also</u> <u>Donnell</u>, 52 Cal.App. 3d at 777 (trial

17  court properly admitted evidence of other bank robbery to infer defendant committed charged bank

18  robbery because "the number and distinctiveness of the marks shared by the two incidents are

19  sufficient to have raised a strong inference that the perpetrator of one was included among the

20  perpetrators of another.")

21          Contrary to the situation in <u>Sullivan</u> and <u>Donnell</u>, Petitioner attempted to introduce evidence

22

23          _____

      [3]  California Evidence Code section 1101 states:

24      "(a) Except as provided in this section and in Sections 1102, 1103, 1108, and 1109, evidence of
      a person's character or a trait of his or her character (whether in the form of an opinion, evidence

25      of reputation, or evidence of specific instances of his or her conduct) is inadmissible when
      offered to prove his or her conduct on a specified occasion.  ¶  *(b) Nothing in this section*

26      *prohibits the admission of evidence that a person committed a crime, civil wrong, or other act*
      *when relevant to prove some fact (such as motive, opportunity, intent, preparation, plan,*

27      *knowledge, identity, absence of mistake or accident, or whether a defendant in a prosecution*
      *for an unlawful sexual act or attempted unlawful sexual act did not reasonably and in good faith*

28      *believe that the victim consented) other than his or her disposition to commit such an act.*  ¶  (c)
      Nothing in this section affects the admissibility of evidence offered to support or attack the
      credibility of a witness."  Cal. Ev. Code §1101 (emphasis added).

1  of other bank robberies to demonstrate Petitioner did not commit the charged crimes, or at least to

2  create a reasonable doubt of his guilt.  (Lodgment No. 2 at 108.)   Further, defense counsel raised this

3  very argument during its renewed motion to admit the uncharged bank robbery evidence at trial.

4  (Lodgment No. 2 at 1374.)  The court rejected the argument and reasoned that the evidence was

5  similarly insufficient when the prosecution attempted to introduce it under section 1101 before trial

6  because it was too general to link it to the six suspects.  (Id. at 1374-75.)  The defense countered by

7  analogizing that under both section 1101 and the third party culpability defense, there did not need to

8  be proof of an identifiable person who committed the other bank robberies for evidence to be

9  admissible.  (Id. at 1375.)  The court disagreed and reasoned that allowing witnesses to come in and

10  testify about similarities between the M.O. of the charged and uncharged crimes without having a

11  more solid link went beyond the scope of Hall, and clarified that "[t]hird party culpability is . . .

12  specific. It actually says there's an identifiable person above and beyond just somebody out there

13  with the motive or opportunity to commit the crime."  (Lodgment No. 2 at 1375, 1381, 1383.)  In

14  contrast, section 1101 allows evidence to show that a defendant had the motive or opportunity to

15  commit the crime as proof of a propensity to commit similar crimes.  Cal. Ev. Code §1101(b).  Thus,

16  because the trial court properly held third party culpability requires a link between the uncharged

17  crime and the charged crime, beyond mere motive or opportunity to commit the crime, Petitioner's

18  alternative contention fails.  See Hall, 41 Cal.3d at 833; Holmes, 547 U.S. at 327.

19      Instead, the state courts correctly determined that evidence of other black males, wearing

20  masks, with shotguns, robbing banks in an aggressive style was too generic to admit because nothing

21  in the proffered evidence provided a link to the charged robberies and its admission could have

22  potentially misled or confused the jury.  See Holmes, 547 U.S. at 327 (evidence tending to prove that

23  another person committed the crime with which defendant is charged may be excluded when it is too

24  remote and lacks a sufficient connection between the other person and the charged crime.)

25      Even were the exclusion of other bank robberies to rise to the level of constitutional error,

26  any erroneous exclusion did not have "a substantial and injurious effect" on the verdict because there

27  was substantial evidence linking Saibu to the charged crimes.  The testimony of Kinsel placed Saibu

28  at the crimes as a key participant and organizer.  (Lodgment No. 2 at 1416, 1421, 1426, 1452.)

1   DeWayne Cummings Sr. testified that Saibu was with Kinsel at Cummings Sr.'s home the morning

2   of August 29, 2005, the day of one of the robberies.  (Id. at 1157-64.)  San Diego Police Department

3   Detective McGhee testified that Saibu falsely claimed he did not know Kinsel, and provided multiple

4   false alibis to law enforcement.  (Id. at  2356-60.)  Accordingly, even if the jury heard the evidence

5   of other uncharged robberies, there was sufficient independent evidence for the jury to find Petitioner

6   guilty beyond a reasonable doubt.

7       For the above reasons, the state court's denial of this claim was neither contrary to, nor an

8   unreasonable application of, clearly established Supreme Court law.  Williams, 529 U.S. at 412-13.

9   Saibu is not entitled to relief as to this claim.

10      2.      *Accomplice Jury Instruction CALCRIM No. 335*

11      Saibu alleges in claim two that his due process rights under the Fifth Amendment and his

12  right to a jury determination of the facts under the Sixth Amendment were violated because the

13  accomplice instruction given in this case, CALCRIM  No. 335, lowered the prosecution's burden of

14  proof by instructing the jury that the evidence supporting the testimony of an accomplice need only

15  be "slight" and "tend to" connect Petitioner to the crime, rather than requiring  the evidence

16  supporting the testimony be subject to the proof beyond a reasonable doubt standard.  (Pet. at 7;

17  Exhibit at 20.)  Petitioner contends that each element of the accomplice corroboration requirement

18  must be proved beyond a reasonable doubt, as required for the elements of a charged offense, and

19  that CALCRIM No. 335 undercuts the standard of proof by allowing the jury to find the accused

20  guilty if other evidence "tends to" connect the defendant to the crime charged, thereby violating the

21  federal constitution.  (Exhibit at 25-26.)  Thus, according to Petitioner,  the "jury was never told it

22  had to believe the testimony of the accomplice beyond a reasonable doubt, [and therefore] the jury

23  could not have understood the aggregate of the accomplice testimony and the supporting evidence

24  had to establish guilt beyond a reasonable doubt."  (Exhibit at 26.)

25      Respondent argues that the United States Supreme Court "has never required that the

26  Constitution requires corroboration of accomplice testimony or instruction on such corroboration."

27  (Resp's Mem. at 21.)  Because there is no clearly established federal law for the Court of Appeal to

28  apply, Respondent argues Petitioner's second claim must fail.  (Id.)

1      Saibu raised this claim in a petition for review he filed in the California Supreme Court

2    which was silently denied.  (Lodgment No. 7, 8.)  As before, this Court must "look through" to the

3    California appellate court's decision denying the claim.  See Ylst, 501 U.S. at 801-06.  That court

4    summarized Petitioner's claims as follows:

5              Specifically, Saibu maintains that CALCRIM No. 335 is constitutionally
       infirm because (1) it failed to tell the jury that the accomplice, Kinsel, had to be
6      credible beyond a reasonable doubt; and (2) the language instructing the jury that the
       evidence supporting Kinsel's testimony only had to be "slight" and "tend to connect
7      the defendant to the commission of the crimes" did not require proof beyond a
       reasonable doubt.  We reject this contention.
8              .  .  .

9              Saibu's claim that CALCRIM No. 335 as given by the court unconstitutionally
       lessened the prosecutions' burden of proof by "requir[ing] far less proof than [proof]
10     beyond a reasonable doubt," is unavailing.  In People v. Frye (1998) 18 Cal.4th 894,
       965-966, the California Supreme Court held that under the principles governing the
11     law of accomplices, "[c]orroboration need only be slight" and rejected the defendant's
       characterization of the accomplice corroboration requirement as an element of the
12     crime subject to proof beyond a reasonable doubt.

13   (Lodgment No. 6, at 34-36.)

14      As a general rule, challenges to jury instructions are questions of state law and it is well

15   established that alleged state law errors are not cognizable in habeas corpus review.  See Estelle v.

16   McGuire, 502 62, 71-72 (1991); Pulley v. Harris, 465 U.S. 37, 41 (1984); O'Bremski v. Maass, 915

17   F.2d 418, 423 (9th Cir. 1990).  Federal habeas relief is warranted only in cases where a petitioner

18   establishes that the ailing instruction by itself "so infected the entire trial that the resulting conviction

19   violates due process."  McGuire, 502 U.S. at 71-72; see also Donnelly v. DeChristoforo, 416 U.S.

20   637, 643 (1974) (explaining that the challenged instruction cannot merely be "undesirable,

21   erroneous, or even 'universally condemned'" — it must violate some constitutional right); Townsend

22   v. Knowles, 562 F.3d 1200, 1209 (9th Cir. 2009).  The instruction may not be judged in artificial

23   isolation, rather, it must be considered in the context of both the instructions as a whole and the trial

24   record.  See  McGuire, 502 U.S. at 72.  McGuire presupposes that the jury instruction was somehow

25   faulty under state law.  See Id. at 71-72.

26      Petitioner acknowledges that due process does not require corroboration of accomplice

27   testimony, but argues the "issue of whether corroboration of accomplice testimony is part of the due

28   process requirement of proof beyond a reasonable doubt is distinct from the issue of whether the

1   accomplice *instruction* undermined the reasonable doubt standard." (Traverse at 10) (emphasis

2   added.)

3       A review of the trial record and panoply of jury instructions demonstrates that CALCRIM

4   No. 335 did not reduce the prosecution's burden of proof, nor did it violate Petitioner's due process

5   rights.  The trial court first  instructed the jury to "[p]ay careful attention to all of [the] instructions

6   and consider them together."  (Lodgment No. 2, at 3002.)  Shortly thereafter the court gave the

7   standard reasonable doubt instruction CALCRIM 220[4], followed closely by a modified version of

8   CALCRIM No. 335, as follows:

9           If the crimes of [c]onspiracy to commit robbery, kidnapping, robbery, assault with a
            deadly weapon, or unlawful driving or taking of a vehicle were committed, then
10          Rachel Kinsel was an accomplice to those crimes. [¶] You may not convict the
            defendant based on the statement or testimony of an accomplice alone.  You may use
11          the statement or testimony of an accomplice to convict the defendant only if: [¶] 1.
            The accomplice's statement or testimony is supported by other evidence that you
12          believe; [¶] 2. That supporting evidence is independent of the accomplice's statement
            or testimony; AND [¶] 3. That supporting evidence *tends to* connect the defendant to
13          the commission of the crimes. [¶] Supporting evidence, however, may be *slight*.  It
            does not need to be enough, by itself, to prove that the defendant is guilty of the
14          charged crime, and it does not need to support every fact about which the witness
            testified.  On the other hand, it is not enough if the supporting evidence merely shows
15          that a crime was committed or the circumstances of its commission.  The supporting
            evidence must tend to connect the defendant to the commission of the crime. [¶] The
16          evidence needed to support the statement or testimony of one accomplice cannot be
            provided by the statement or testimony of another accomplice. [¶] However,
17          Defendant's own statement and inferences therefrom may be sufficient corroborative
            testimony. [¶] Any statement or testimony of an accomplice that tends to incriminate
18          the defendant should be viewed with caution.  You may not, however, arbitrarily
            disregard it.  You should give that statement or testimony the weight you think it
19          deserves after examining it with care and caution and in the light of all the other
            evidence.
20
    (Lodgment No. 2 at 3016-17.)
21
        Petitioner references three notes sent by the jury asking for clarification of CALCRIM No.
22
    335 presumably in support of his claim, but does not demonstrate why these notes are relevant or
23

24   _____

25       [4]  The court instructed the jury with CALCRIM No. 220 as follows: "A defendant in a criminal case is
    presumed to be innocent.  This presumption requires that the People prove each element of a crime and special
26   allegations beyond a reasonable doubt.  Whenever I tell you the People must prove something, I mean they must
    prove it beyond a reasonable doubt. ¶ Proof beyond a reasonable doubt is proof that leaves you with an abiding
27   conviction that the charge is true.  The evidence need not eliminate all possible doubt because everything in life
    is open to some possible or imaginary doubt. ¶ In deciding whether the People have proved their case beyond
28   a reasonable doubt, you must impartially compare and consider all the evidence that was received throughout
    the entire trial.  Unless the evidence proves the defendants guilty beyond a reasonable doubt, they are entitled
    to an acquittal and you must find them not guilty."  (Lodgment No. 2 at 3004.)

1   what they show.[5]  (Exhibit at 21-23.)  Instead, Petitioner argues that the "reasonable doubt

2   instruction was in effect modified by CALCRIM 335 and created conflicting instructions."  (Id. at

3   25.)  According to Petitioner, CALCRIM No. 335 allows a defendant to be convicted based on

4   accomplice testimony and permits the evidence supporting the accomplice testimony to be "slight"

5   and "tend to connect" the defendant to the crime, thereby undermining the reasonable doubt

6   instruction.  (Id. at 26.)  Therefore, a jury could determine a defendant's guilt by relying on

7   independent evidence which supported the accomplice's statement that was not subject to the

8   reasonable doubt standard.  (Id.)

9          After reviewing the instructions, notes, and responses, it is clear that Petitioner's argument is

10  unpersuasive.  Here, the jury was properly instructed that it must find guilt beyond a reasonable

11  doubt for all charged crimes in CALCRIM No. 220, and specifically that "[i]n deciding whether the

12  People have proved their case beyond a reasonable doubt, you must impartially compare and

13  consider *all the evidence* that was received throughout the entire trial."  (Lodgment No. 2 at 3004)

14  (emphasis added.)  Although the jury did not need to determine whether Kinsel's accomplice

15  testimony was corroborated by evidence beyond a reasonable doubt, the jury was required to weigh

16  all the evidence, including evidence received that supported Kinsel's testimony, in determining

17

18          [5]  In note fourteen, the jury asked "Does guilt of one crime fulfill the requirement of being
19  evidence that tends to connect, although slight? (if we believe Rachel, and we believe there is guilt in
    another crime, can that belief in guilt of one crime be used as supporting evidence in another crime?)"
20  (Lodgment No. 1 at 473.)  In note fifteen, the jury asked "Can we use a supporting statement to connect
    more than 1 defendant and satisfy item 3 of instruction 335, even though the evidence doesn't
21  specifically connect a particular defendant?"  (Id. at 474.)
           The Court answered, "In question 14 you ask in part "does guilt of one fulfill the requirement
22  of being evidence that tends to connec [sic]. . . " ¶ You may not use a finding of guilt on other crimes
    as supporting evidence tending to connect one to the commission of the crime in question.  ¶ However,
23  the facts used to reach such a finding may be used as supporting evidence if those facts tend to connect
    one to the crime in questions.[sic] ¶ In question 15 you ask about supporting statements.  ¶ You may use
24  a defendants own statement[s] as corroboration against him but not against the other defendants.  ¶ To
    address both questions refer to the last four paragraphs of CalCrim 335.  (Id. at 475.)  The Court also
25  stated, "In Jury Note #15, you asked the following question:  ¶ 'Can we use a supporting statement to
    connect more than 1 defendant and satisfy item 3 of instruction 335, even though the evidence doesn't
26  specifically connect a particular defendant'?  During a court inquiry yesterday, October 18, 2006, you
    specified that the supporting statement mentioned in Jury Note #15, was a statement from Rachel Kinsel,
27  an accomplice.  ¶ ANSWER: ¶ For Purposes of CALCRIM 335 item 3, you may consider testimony of
    an accomplice to connect more than one defendant to the commission of a crime if: ¶ 1.  The
28  accomplice's testimony is supported by other evidence that you believe; ¶ 2. That supporting evidence
    is independent of the accomplice's statement or testimony, AND  ¶ There is other evidence that you
    believe which also tends to connect the other defendants to the commission of the crime."  (Id. at 476.)

1   whether they were convinced of Saibu's guilt beyond a reasonable doubt.

2          Jurors are presumed to have followed the instructions as a whole, including the instructions

3   regarding the prosecution's burden of proof for the elements of the charged crimes.  See Shannon v.

4   United States, 512 U.S. 573, 585 (1994); Richardson v. Marsh, 481 U.S. 200, 2006 (1987).

5   Additionally, the jury sent multiple notes concerning CALCRIM 335 to verify they thoroughly

6   understood the requirements of the instruction before applying it to the evidence.  (Lodgment No. 1

7   at 473-76. )  It is immaterial that CALCRIM No. 335 included sub-parts that allowed supporting

8   evidence to be "slight" or "tend to" connect a defendant to the crime for the jury to convict on the

9   basis of Kinsel's accomplice testimony, as it does not alter the requirement that the prosecution was

10  required to prove the elements of robbery, kidnapping for robbery, conspiracy, and false

11  imprisonment beyond a reasonable doubt.  Accomplice corroboration is not an element of any of the

12  crimes with which Petitioner was charged, and therefore, CALCRIM No. 335 did not reduce the

13  prosecution's burden of proof because the prosecution was not required to prove the veracity of

14  Kinsel's testimony beyond a reasonable doubt.  Therefore, the Court of Appeal properly rejected

15  Petitioner's claim that CALCRIM No. 335 lessened the prosecution's burden of proof because the

16  evidence corroborating Kinsel's testimony was not an element of the charged crimes and subject to

17  the proof beyond a reasonable doubt standard.

18         In addition, there was sufficient independent evidence that served to support Kinsel's

19  testimony connecting  Saibu to the commission of the robberies.  Witness Cummings, Sr. testified

20  that Saibu came over to Cummings Sr.'s house the morning of the August 29th robbery and that his

21  son DeWayne Cummings was there, as well as Kinsel.  (Lodgment No. 2 at 1157-64.)  According to

22  Cummings Sr., Saibu had been to the house three or four times before that day, and Saibu did some

23  work on Cummings Sr.'s house at one point.  (Id. at 1161.)  San Diego Police Detective McGhee

24  testified that Kinsel gave him Saibu's cell phone number, which McGhee called on August 30 and

25  spoke to Saibu.  (Id. at 2362-66.)  During the phone conversation, Saibu said he was in Mississippi

26  and that he had received a phone call from DeWayne Cummings, Sr. asking him to call McGhee.

27  (Id. at 2362.)  McGhee later interviewed Saibu at police headquarters, at which time Saibu stated he

28  did not know Kinsel, was in New York during June and July 2005, did not know DeWayne

Cummings and had not done any work at the house.  (Id. at 2356-60.)  Later in the interview, McGhee asked Saibu if Saibu's fingerprints would be found in Kinsel's car, and Saibu stated they would be, probably on the stereo and in the trunk.  (Id. at 2373.)   The trial record thereby demonstrates there was sufficient evidence connecting Saibu to the other defendants, including on the day of one of the robberies, and that there was evidence that he gave false alibis twice to law enforcement, all of which supported Kinsel's testimony describing Saibu as a participant in the robberies.  In addition, Kinsel testified pursuant to a plea agreement which required that she testify truthfully or risk losing the benefits of the agreement which included reducing her sentencing exposure to 4 to 7 years.  (Lodgment No. 2 at 1501-02.)

As demonstrated above, the jury was 1) instructed to consider all the instructions as a whole, 2) given clear instructions regarding the prosecution's burden of proof, and 3) received substantial independent evidence supporting Kinsel's testimony, in addition to being given CALCRIM No. 335. In light of the totality of the instructions and evidence, the accomplice instruction did not serve to lessen the prosecution's burden of proof, therefore, the instruction did not "so infect[] the entire trial that the resulting conviction violate[d] due process."  McGuire, 502 U.S. at 71-72; Middleton v. McNeil, 541 U.S. 433, 437 (2004) ("In a criminal trial, the State must prove every element of the offense, and a jury instruction violates due process if it fails to give effect to that requirement.")

For the foregoing reasons, Petitioner's federal due process rights and right to a jury determination of the facts were not violated by the trial court's instruction of the jury with CALCRIM No. 335.  In addition, Petitioner fails to demonstrate that CALCRIM No. 335 "so infected the entire trial that the resulting conviction violates due process."  McGuire, 502 U.S. at 71-72.  Saibu is not entitled to relief as to this claim, and habeas relief is **DENIED**.

### 3.    *Sufficiency of the Evidence*

In claim three, Saibu argues that his federal due process rights were violated because there was insufficient evidence to corroborate the accomplice testimony of Kinsel.  (Pet. at 8; Exhibit at 30.)  Although Petitioner concedes "in federal practice there is no rule preventing conviction on uncorroborated testimony of accomplices," he argues the doctrine of fundamental fairness, as incorporated in the due process clause, requires that corroboration evidence be subject to the proof

beyond a reasonable doubt standard.  (Traverse at 18; Exhibit at 33-34.)

Respondent counters that Petitioner is not entitled to federal habeas corpus relief on this claim because "corroboration of accomplice testimony is not constitutionally mandated," and therefore, the claim does not present a federal question for this Court to review.  (Respt's Mem. at 18, 21.)  Further, Respondent argues the claim fails under AEDPA because there is no clearly established federal law which the Court of Appeal could apply.  (Id. at 21.)

Petitioner raised this claim in a petition for review he filed in the California Supreme Court which was silently denied.  (Lodgment No. 7, 8.)  Once again, this Court must "look through" to the California appellate court's decision denying the claim.  See Ylst, 501 U.S. at 801-06.  That court summarized Petitioner's claim as follows:

> Kinsel's accomplice testimony incriminatingly linked Saibu with the charged August 13, 19, and 29 bank robberies.  As requested by stipulation of the parties, the court instructed Jury B with a modified version of CALCRIM No. 335, which instructed the jury that if the specified crimes were committed, Kinsel was an accomplice and her testimony had to be corroborated by "other evidence that you believe."  Jury B found Saibu guilty of robbery as charged.

(Lodgment No. 6 at 31.)

After reciting the applicable legal standard, the Court of Appeal concluded:

> Here, the trial record contains evidence, independent of Kinsel's accomplice testimony, which, by showing both that Saibu was with his coconspirators on the day of a charged offense and that he gave the police two false alibis after the crime, reasonably tends to connect him with the commission of the bank robberies and is sufficient to corroborate Kinsel's accomplice testimony.  Cummings Sr.'s testimony thus placed Saibu in Cummings Sr.'s home with Cummings and Kinsel, in the morning on August 29, the day appellants, Cummings and Coleman allegedly robbed the Wells Fargo Bank in Mira Mesa as charged in count 9.
>
> Jury B also heard Detective McGhee's recorded telephone interview of Saibu, which took place the next day, August 30, when McGhee called Saibu's cell phone number, which McGhee had obtained from Kinsel.  The transcript of the interview establishes that Saibu gave Detective McGhee a false alibi.  Specifically, the transcript shows that when Detective McGhee told Saibu that his name had come up in connection with a series of bank robberies that were under investigation, Saibu falsely told Detective McGhee he was in Mississippi with his family, and he had been there about a week.  When Detective McGhee told Saibu he wanted to verify that Saibu was in Mississippi and asked him to step outside and look at the address, or pick up a piece of mail and check out the address, Saibu refused.  When Detective McGhee asked Saibu who was involved in the robberies, Saibu responded, "Rachel [Kinsel] and Ace [Valentino]," adding that "Ace" was someone named Antonio whose last name he did not know.  Saibu said he would return from Mississippi on Friday and would meet with Detective McGhee in person upon his return.  Detective McGhee testified that Saibu did not contact him that Friday as he said he would.

Detective McGhee also testified he eventually interviewed Saibu at the police headquarters, told him he wanted to talk about some robberies, and asked Saibu where he had been.  Saibu gave a second false alibi, telling Detective McGhee he left for New York in June or July, and remained there until around Christmas time.  Saibu then changed the starting date of his New York trip to "July or August," and said he was visiting with a childhood friend and with his father.  When Detective McGhee asked Saibu whether he knew a woman named Rachel Kinsel, Saibu falsely said he had never heard that name before.  When Detective McGhee asked Saibu whether he knew a man named "Ace" or Valentino, or Cummings, Saibu falsely indicated he did not.

We conclude that the foregoing independent evidence, by placing Saibu with coconspirators on the day of the August 29 Wells Fargo Bank robbery, and by establishing that he twice gave a false alibi to the police following the crime thereby evincing a consciousness of guilt, is sufficient to corroborate Kinsel's accomplice testimony.

(Lodgment No. 6 at 32-34.)

Federal courts do not require corroboration of accomplice testimony.  See Augenblick, 393 U.S. at 352 ("When we look at the requirements of procedural due process, the use of accomplice testimony is not catalogued with constitutional restrictions"); Williams v. United States, 308 F.2d 664, 666 (9th Cir. 1962.)  Petitioner recognizes that there is no corroboration requirement in federal court, but argues that "a state prisoner who alleges that the evidence in support of his state conviction cannot be fairly characterized as sufficient to have led a rational trier of fact to find guilt beyond a reasonable doubt has stated a federal constitutional claim."  (Traverse at 18.)  Petitioner argues that the evidence corroborating Kinsel's testimony, specifically Saibu's phone calls to Kinsel, his inconsistent statements about knowing Kinsel, his lies about his whereabouts at the time of the crime, and Cummings Sr.'s testimony that Saibu was with Kinsel the morning of one of the robberies, does not connect Saibu to the crimes, rather, it   merely connects him to Kinsel or shows that he made inconsistent statements.  (Exhibit at 30-31.)

Although Petitioner urges the Court to extend the proof beyond a reasonable doubt standard for corroboration evidence of accomplice testimony under the fundamental fairness doctrine, this Court declines.  As the Court of Appeal noted, there was sufficient evidence connecting Saibu to the other defendants and the perpetration of the charged crimes for the jury to find him guilty beyond a reasonable doubt, irrespective of Kinsel's testimony. Therefore, Petitioner's due process rights were not violated  even though the evidence corroborating Kinsel's testimony was not subject to the proof

1  beyond a reasonable doubt standard.  Furthermore, the Court of Appeal's denial of this claim was not

2  an unreasonable application of the facts in light of the evidence presented to the state court and relief

3  is **DENIED**.

4       4.      *Consecutive Sentence on Count Two*

5       Petitioner contends in claim four that the trial court's imposition of a consecutive sentence on

6  count two should be modified to a concurrent term because the trial court was precluded from

7  imposing a consecutive sentence for that count pursuant to Blakely v. Washington, 542 U.S. 296

8  (2004).  (Pet. at 10; Exhibit at 36-38.)  In particular, Saibu argues that the facts supporting the

9  imposition of a consecutive sentence on the false imprisonment conviction in claim two should have

10  been found by the jury because it was a separate crime that occurred during a single bank robbery.

11  (Exhibit at 38.)  Count two was related to the detention of Lucy Verduzco, a customer, during the

12  August 13, 2005, Wells Fargo bank robbery, and Saibu was convicted in count three of robbery for

13  that crime.  (Id.)  Petitioner contends the trial court erroneously stated that "[s]eparate bank robberies

14  were committed at separate times and places therefore consecutive sentencing applies," but these

15  comments only addressed consecutive sentences for different bank robberies and not for multiple

16  crimes occurring during a single robbery.  (Id.)  Saibu argues that Apprendi v. New Jersey, 530 U.S.

17  466 (2000), and its progeny required findings of fact to be "made by the jury for a consecutive

18  sentence to be lawfully imposed for count two." (Exhibit at 38.)

19       Respondent counters that the California Court of Appeal's denial of this claim was not

20  contrary to, or an unreasonable application of, clearly established federal law, and was not based on

21  an unreasonable determination of the facts in light of the evidence presented.  (Respt's Mem. at 21.)

22  In support, Respondent cites Oregon v. Ice, 555 U.S. 160  (2009), in which the United States

23  Supreme Court held that the Sixth Amendment does not require a jury determination of any fact

24  declared necessary to the imposition of a consecutive sentence where a defendant has been tried and

25  convicted of multiple offenses, each involving discrete sentencing prescriptions, because the

26  determination of facts underlying consecutive sentences lies outside the historical province of the

27  jury and no "impelling reason" counsels in favor of abrogating the states' interest in providing rules

28  to guide courts in making such determinations.  (Id. at 22.)

1  Saibu raised this claim in a petition for review he filed in the California Supreme Court

2  which was silently denied.  (Lodgment No. 7, 8.)  As before, this Court must "look through" to the

3  California appellate court's decision denying the claim.  See Ylst, 501 U.S. at 801-06.  That court

4  summarized Petitioner's claims as follows:

5          A.    *Background*

6             Saibu was convicted of count 2 (§ 236) for the false imprisonment of Lucy
   Verduzco on August 13 and of count 3 (§ 211) for the robbery of the Wells Fargo

7          Bank [] in east San Diego on that same date.  The court imposed consecutive
   sentences for those convictions.

8

        B.    *Analysis*

9

10            Saibu asserts the consecutive sentence for count 2 should be modified to a
   concurrent term because Blakely required the jury to make the findings of fact
   required to impose a consecutive sentence for that count.  As Saibu acknowledges,

11   however, this court is bound by People v. Black (2007) 41 Cal.4th 799, 806 (Black
   II).  (Auto Equity Sales, Inc. v. Superior Court (1962) 57 Cal.2d 450, 455.)  In Black

12   II, the California Supreme Court held that discretionary imposition of consecutive
   sentences does not implicate a defendant's Sixth Amendment rights.  (Black II, supra,

13   41 Cal.4th at p. 821.)  The California Supreme Court explained: "The high court's
   decision in Cunningham [v. California (2007) 549 U.S. 270] does not call into

14   question the conclusion we previously reached regarding consecutive sentences.  The
   determination whether two or more sentences should be served in this manner is a

15   'sentencing decision [] made by the judge after the jury has made the factual findings
   necessary to subject the defendant to the statutory maximum sentence on each

16   offense' and does not 'implicate[] the defendant's right to a jury trial on facts that are
   the functional equivalent of elements of an offense.' [Citation.]" (Black II, supra, 41

17   Cal.4th at p. 823, citing People v. Black (2005) 35 Cal.4th 1238, 1264 (Black I).
   Pursuant to Black II, we conclude the court did not violate Saibu's federal

18   constitutional right to a jury trial in imposing consecutive sentences.

19 (Lodgment No. 6 at 43-44.)

20      In a series of cases beginning with Apprendi v. New Jersey, 530 U.S. 466 (2000), the

21 Supreme Court declared that any fact, other than a prior conviction, that increases the sentence for a

22 crime beyond the statutory maximum must be proved beyond a reasonable doubt or admitted to by

23 the defendant.  See Cunningham v. California, 549 U.S. 270, 274-75 (2007) (citing Apprendi, 530

24 U.S. 466) and Blakely v. Washington, 542 U.S. 296, 303 (2004); see also United States v. Booker,

25 543 U.S. 220 (2005).

26      In Cunningham, 549 U.S. at 274-75, the United States Supreme Court held that California's

27 determinate sentencing law ("DSL") violated a defendant's Sixth Amendment right to a trial by jury

28 because it placed sentence-elevating fact-finding within the judge's province.  The Court stated that

1   California's sentencing scheme was unconstitutional to the extent it permitted imposition of upper

2   term sentences based on findings made by a judge, other than the fact of a prior conviction, under a

3   preponderance of the evidence standard, rather than by a jury beyond a reasonable doubt.  Id.

4   Following Cunningham, the California Supreme Court vacated an earlier decision which held that

5   California's DSL was constitutional, and found that, "under the DSL[,] the presence of one

6   aggravating circumstance renders it lawful for the trial court to impose an upper term sentence."  See

7   People v. Black, 41 Cal. 4th 799, 815 (2007) ("Black II ").  The court in Black II, further held that

8   the "imposition of consecutive sentences does not violate a defendant's Sixth Amendment right to

9   jury trial."  Id. at 821.

10      Petitioner acknowledges that this Court must follow Apprendi and its progeny, but argues

11   that, Black II was incorrectly decided with respect to the determination that Blakely does not "require

12   the jury to make findings of fact necessary to impose consecutive sentences under the Determinate

13   Sentencing Law (DSL) and the Rule of Court."   (Exhibit at 34.)  Instead, according to Petitioner, in

14   State v. Ice, 343 Or. 170 (Ore. S. Ct. 2007) the Oregon Supreme Court found that the imposition of

15   consecutive sentences violated the defendant's right to a jury trial under the Sixth Amendment

16   reasoning that Apprendi, Blakely, and Booker, established "the right to a jury trial respecting

17   whatever factors a legislature has identified as permitting the enhancement of an otherwise

18   statutorily limited sentence."  (Id.)

19      Petitioner's argument is unavailing.  In Ice, the United States Supreme Court reversed the

20   holding in State v. Ice,  343 Or. 170,  upon which Petitioner relies in support of his argument that

21   Black II was incorrectly decided. Ice, 555 U.S. at 172.  After being convicted of two counts of

22   burglary and four counts of sexual assault for entering the home of an 11-year old girl, the defendant

23   in Ice received two convictions for burglary, and a consecutive term for sexual assault added to each

24   of the burglary sentences.  Id. at 166.  The Oregon Supreme Court reversed, holding that Apprendi

25   applied because imposing consecutive sentences increased the total number of years the defendant

26   would be imprisoned.  Id.  In overturning the state court's decision, the United States Supreme

27   Court determined that "historical practice and respect for state sovereignty" counseled against

28   extending the rule in Apprendi to consecutive sentencing, and held that the Sixth Amendment allows

1    judges, rather than juries, to find  facts necessary to the imposition of consecutive sentences for

2    multiple offenses.  Id. at 168.

3         Here, the Court of Appeal's affirmation of  the trial court's sentencing determination

4    pursuant to Black II did not violate Petitioner's right to a jury trial by imposing consecutive

5    sentences.  Instead, the appellate court was in accord with Ice when it noted that the decision to

6    impose consecutive terms is within the trial judge's discretion  "after the jury has made the factual

7    findings necessary to subject the defendant to the statutory maximum sentence on each offense" and

8    does not "implicate[] the defendant's right to a jury trial on facts that are the functional equivalent of

9    elements of an offense.'" (Lodgment No. 6 at 44, citing Black II.)  Because the Court of Appeal's

10   decision was consistent with  Ice, the adjudication of this claim by the state court was neither

11   contrary to, nor involved an unreasonable application of, clearly established federal law, nor was it

12   based on an unreasonable determination of the facts.  Williams, 529 U.S. at 412-13.  For the

13   foregoing reasons, Petitioner is not entitled to relief on this claim and relief is **DENIED**.

14        **V.      CONCLUSION AND ORDER**

15        For the foregoing reasons, **IT IS HEREBY ORDERED** that the Petition for Writ of Habeas

16   Corpus is **DENIED**.

17

18   DATED:  August 5, 2011

19

20   _____
     **CATHY ANN BENCIVENGO**
21   United States Magistrate Judge

22

23

24

25

26

27

28